[Cite as *State v. Smith*, 2019-Ohio-4706.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-16 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-472 |
| | : | |
| KATHY J. SMITH | : | (Criminal Appeal from |
| | : | Common Pleas Court ) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of November, 2019.

. . . . . . . . . . .

DAVID M. MORRISON, Atty. Reg. No. 0087487, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

PETER R. CERTO, Atty. Reg. No. 0018880 and STEVEN E. BACON, Atty. Reg. No. 0059926, One South Main Street, Suite 1590, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Kathy Smith appeals from her conviction on charges of aggravated vehicular homicide, aggravated vehicular assault, and operating a vehicle under the influence of alcohol.

{¶ 2} Smith advances three assignments of error. First, she contends the trial court erred in partially overruling a motion to suppress and allowing the State (1) to present testimony from EMT personnel about her admission to consuming alcohol prior to a fatal traffic accident and (2) to introduce medical records and related testimony concerning her blood-ethanol[1] level at the time of her hospital admission following the accident. Second, she claims the trial court erred in allowing the records concerning her blood-ethanol level to be introduced into evidence without proper authentication. Third, she asserts that the trial court erred in allowing rebuttal testimony from a pharmacologist as to whether administering Ativan upon her admission to the hospital was equivalent to initiating a medical protocol for alcohol withdrawal. Smith contends this testimony exceeded the scope of the pharmacologist's expertise.

{¶ 3} The record reflects that Smith was involved in a fatal traffic accident on August 27, 2016. The accident occurred when the vehicle she was driving crossed the center line on Hussey Road in Greene County and collided head-on with another vehicle, killing the other driver and seriously injuring a passenger in the other car. Smith also

---

[1] Ohio criminal statutes generally use the term "alcohol" when prohibiting driving under the influence and for procedures for testing the volume of "alcohol" in one's system. In the Revised Code, " 'Alcohol' means ethyl alcohol" (except denatured or wood alcohol.) R.C. 4301.01(B)(1.) Ethyl alcohol is also known as ethanol. In medical circles, "ethanol," often abbreviated as EtOH, is the preferred term. Because the blood-ethanol test in this case was a hospital test performed for medical diagnostic purposes, for clarity we have tried to use the term "ethanol" when referring to the hospital test or testimony about it. Nevertheless, the terms are interchangeable.

sustained serious injuries. While being assisted by paramedics, Smith told one of them that she had consumed alcohol. She told another paramedic that she had consumed wine. Smith was transported to Miami Valley Hospital (MVH), where her blood-ethanol level was tested.

{¶ 4} Following the accident, Ohio State Highway Patrol trooper Jaysen Kelly began an investigation and created an accident report. (11/3/2017 Suppression Tr. at 30.) His report included Smith's blood-ethanol level of 343 mg/dl from the test performed at MVH. (*Id.* at 31; *see also* State's Exhibit 33.) The trooper obtained this information from the hospital via R.C. 2317.022, which authorizes a law-enforcement officer conducting a criminal investigation to obtain a copy of test results showing the level of alcohol in a suspect's blood, breath, or urine.

{¶ 5} Investigator Fred Meadows, an employee of the Greene County prosecutor's office, commenced his own investigation in November 2016. (*Id.* at 14.) In so doing, he obtained the trooper's accident report. (*Id.* at 15.) In addition to containing information about Smith's blood-ethanol level, the trooper's accident report also reflected that the Xenia Fire Department had responded to the crash. (*Id.* at 16.) Meadows subsequently received a grand jury subpoena and court order to obtain the fire department's "run sheet" for the accident involving Smith. (*Id.* at 18-20.) That run sheet identified the two paramedics involved. It also included Smith's statements to them about consuming alcohol. (*Id.* at 21.) Meadows then spoke with the paramedics and obtained written statements from them. (*Id.* at 22.) According to the statements, one of the paramedics asked Smith whether she had consumed any alcohol that day, and she responded that she had done so. The other paramedic asked whether she had been drinking. She

responded affirmatively and specified that she had been drinking wine. (*Id.* at 22-23.)

{¶ 6} Based on the information he had received, Meadows prepared an affidavit for a search warrant to obtain Smith's medical records from MVH, including her blood-ethanol test results. Although Trooper Kelly already had obtained those results through the process set forth in R.C. 2317.022, the prosecutor's office had concerns about the admissibility of medical records obtained under the statute but without a search warrant. In his affidavit, Meadows averred that Smith had driven left of center, striking another car and killing the driver and seriously injuring a passenger. He further averred that Smith had suffered incapacitating injuries and had been transported to the hospital by the Xenia Fire Department. Meadows then averred:

4. Affiant has reviewed the crash report, witness statements, autopsy report and coroner's verdict. Affiant also has personally interviewed the paramedics who responded to the crash.

5. Affiant was advised that Kathy Smith told the treating paramedic in the back of the ambulance that she had consumed alcohol prior to the crash; she also told a paramedic who assisted in extracting her from the vehicle that she consumed wine prior to the crash.

(*Id.* at 24; *see also* State's Exh. 2 to suppression hearing.)

{¶ 7} Finally, Meadows averred that he believed information contained within medical records maintained by MVH would aid law enforcement. Based on Meadows' affidavit, a search warrant was issued for Smith's hospital records in January 2017. (*Id.* at 25.) Meadows received the records, including the blood-ethanol test results, shortly thereafter. (*Id.* at 26.)

{¶ 8} In March 2017, Smith was indicted on charges including aggravated vehicular homicide and aggravated vehicular assault. She subsequently filed a motion to suppress, and the trial court held a multi-day suppression hearing. After the hearing but before the trial court ruled on the suppression motion, the parties agreed to proceed by a bill of information, and the indictment was dismissed. The June 25, 2018 bill of information charged Smith with two counts of aggravated vehicular homicide, two counts of aggravated vehicular assault, and one count of operating a vehicle under the influence of alcohol.[2] (Doc. #1.)

{¶ 9} With regard to the suppression issue, the State conceded during the suppression hearing that the hospital records and blood-ethanol test results obtained by Trooper Kelly were not admissible at trial because the trooper obtained them without a search warrant.[3] Smith argued that a search warrant also was required to obtain the paramedics' "run sheet" and that a grand jury subpoena was insufficient. Smith additionally asserted that the hospital records and blood-ethanol test results obtained with

---

[2] Although there was one victim of the aggravated vehicular homicide (the deceased driver) and one victim of the aggravated vehicular assault (the injured passenger), the bill of information charged the offenses in alternative ways. It charged aggravated vehicular homicide by causing the death of another as a proximate result of committing a violation of R.C. 4511.19(A) and by recklessly causing the death of another while operating a motor vehicle. The bill of information similarly charged aggravated vehicular assault by causing serious physical harm to another as a proximate result of committing a violation of R.C. 4511.19(A) and by recklessly causing serious physical harm to another while operating a motor vehicle. At sentencing, the trial court correctly applied merger and imposed only one sentence for aggravated vehicular homicide and one sentence for aggravated vehicular assault.

[3] We are not required to accept the State's concession that a search warrant is required for records of alcohol or drug testing performed by a hospital solely for medical reasons. We note that our district, and several others, have not voiced an opinion on this issue, and this opinion is neither an endorsement nor a rejection of the concession.

a search warrant were inadmissible because Meadows' affidavit contained tainted information from the EMS run sheet. (11/3/17 Suppression Tr. at 8.) Smith further argued that Meadows' affidavit was deficient on its face. (*Id.*) She also maintained that the identity of the two paramedics and their knowledge of her statements about drinking alcohol were discovered through the improperly obtained run sheet. (2/9/18 Suppression Tr. at 11-12, 14-16.)

{¶ 10} The trial court resolved the foregoing issues in a December 11, 2018 entry (incorrectly captioned "Judgment Entry Re: Motion to Dismiss".) It held that the two paramedics could testify at trial about Smith's admission to drinking alcohol. The trial court determined that Smith was not in the custody of law enforcement when she made the statements, that they were voluntary responses to the paramedics' questions, that no waiver of constitutional rights was required, and that Smith's statements about drinking alcohol were not protected by any statutory privilege. (Doc. # 31 at 1-2.) With regard to the paramedics' run sheet, the trial court determined that it constituted a "medical record" in which Smith maintained an "expectation of privacy."[4] It refused to allow the run sheet to be admitted at trial but allowed the paramedics to testify regarding their own observations at the scene and Smith's statements to them about drinking alcohol. (*Id.* at 2.) As for the search warrant, the trial court reasoned:

> The affidavit revealed the Defendant was involved in a head on collision by crossing the centerline resulting in the serious and mortal injury to passengers in the other vehicle. The paramedics advised that the Defendant said she had been drinking wine prior to the crash. The affidavit

---

[4] The State does not challenge these conclusions so they are not before us.

requested the hospital maintain[ed] medical records of the Defendant, who had been removed to the hospital for treatment, for blood testing for ethanol.

Based upon these facts, the Court finds there was sufficient probable cause before the issuing judge to order the search for records relating to the ethanol value of the Defendant taken at Miami Valley Hospital between August 27, 2016 and September 6, 2016. In this regard, the following medical records, identified by page number (as given by the State to the Court) will be admitted as to the yellowed portions of the attached documents: 17, 34, 290, 2754.

The remainder of the 3,500 medical records will not be admitted as not relating to the alcohol testing.

The State may have testimony regarding the processing and testing of the blood by hospital personnel consistent with R.C. 4511.19.

(*Id.* at 3-4.)

{¶ 11} The case proceeded to a jury trial in which Smith was found guilty of all charges against her. The trial court merged the two counts of aggravated vehicular homicide. It also merged the two counts of aggravated vehicular assault. It then sentenced Smith to seven years in prison for aggravated vehicular homicide, five years in prison for aggravated vehicular assault, and six months in jail for operating a vehicle under the influence of alcohol. It ordered these sentences to be served concurrently.

{¶ 12} In her first assignment of error, Smith challenges the trial court's suppression ruling. Specifically, she contends the trial court erred in allowing the two paramedics to testify at trial regarding her statements about consuming alcohol. She also

claims the trial court erred in allowing the State to introduce MVH medical records pertaining to her blood-ethanol level. She asserts that the paramedics' testimony and the blood-ethanol test results were obtained through "a series of acts which violated [her] Fourth Amendment rights." (Appellant's brief at 10.) According to Smith, "[t]hese acts include: 1) obtaining [her] medical/hospital records, including her ethanol levels, from Miami Valley Hospital without a warrant, via R.C. 2317.022; 2) obtaining the EMS Run Sheet for [her] treatment at the accident scene, without a warrant, via Grand Jury Subpoena; and 3) using information learned from these acts in an affidavit in support of a warrant to require Miami Valley Hospital to produce [her] confidential medical records, including lab results as to her ethanol levels, i.e., the same records the State already had." (*Id.*)

{¶ 13} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. But the appellate court must decide the legal questions independently, without deference to the trial court's decision." (Citations omitted) *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 14.

{¶ 14} As set forth above, Smith argues that obtaining her hospital medical records via R.C. 2317.022 and obtaining the EMS run sheet via a grand jury subpoena violated the Fourth Amendment. She asserts that a warrant was required for the medical records and the run sheet. She also contends this improperly-obtained information tainted the subsequent search-warrant affidavit. In response, the State claims Smith "expressly waived any argument that Inv. Meadows' investigation was tainted by Trp. Kelly's first

obtaining Appellant's records through R.C. 2317.022." (Appellee's brief at 10.) In any event, the State contends Meadows' investigation and search-warrant affidavit were independent of the trooper's investigation and did not depend on the medical records obtained by the trooper. With regard to the EMS run sheet, the State asserts that a warrant was not required to obtain the run sheet or the names of the paramedics involved. The State further asserts that a warrant was not required for Meadows to speak to the paramedics as part of a criminal investigation. For these reasons, the State argues that the information contained in the search-warrant affidavit was not tainted by any prior illegality. Smith and the State also disagree about whether Meadows' affidavit was facially sufficient to establish probable cause even if the information it contained was not tainted by illegality. Finally, the State argues that Meadows acted in good faith in relying on a subpoena rather than a warrant to obtain the EMS run sheet and that he acted in good faith in relying on the facially-valid appearance of the warrant he obtained.

{¶ 15} Upon review, we turn first to the State's claim that Smith expressly waived her argument about Trooper Kelly's use of R.C. 2317.022 tainting Meadows' subsequent investigation and affidavit. We find no waiver of this issue. In the suppression proceedings, Smith focused primarily on the information contained in the EMS run sheet. It appears that she did so, however, because the State conceded that Trooper Kelly's use of R.C. 2317.022 to obtain her MVH records was improper and that a warrant was required. (11/3/2017 Suppression Tr. at 6.) Moreover, the State was aware that the trooper allegedly "tainting" Meadows' investigation was an issue in the case. During the suppression hearing, the prosecutor asked Meadows whether he knew at the outset of his investigation that the trooper already had obtained Smith's hospital records. (*Id.* at

26.) Meadows responded that he was aware of that fact and that he had seen those records before undertaking his own investigation and obtaining a search warrant. (*Id.* at 26-27.) The prosecutor then asked Meadows whether he had relied on the information obtained from the trooper when he sought a search warrant and whether his investigation would have proceeded the same way if he had not seen the medical records the trooper previously obtained under R.C. 2317.022. (*Id.* at 27.) The only conceivable purpose for this line of questioning was to refute Smith's assertion that the trooper's reliance on the statute to obtain her medical records had tainted Meadows' subsequent investigation and search-warrant affidavit. Therefore, we decline to find the issue waived below.

**{¶ 16}** As for the merits of Smith's argument about a warrant being required for Trooper Kelly to obtain her medical records from MVH, we will assume arguendo that she is correct. We will do so because the State conceded the issue during the suppression hearing based on case law from other appellate districts.[5] For present purposes, we also will assume arguendo that investigator Meadows could not rely on a subpoena to obtain the EMS paramedics' "run sheet" and that a warrant was required for it too. The trial court reached this same conclusion, finding that the run sheet constituted a "medical record" in which Smith had an "expectation of privacy." Therefore, it excluded the run sheet from

---

[5] Other Ohio appellate districts have recognized that hospital patients have a reasonable expectation of privacy in records of test results concerning alcohol in their blood, breath, or urine and that law enforcement must comply with the Fourth Amendment's warrant requirement before obtaining those records. These courts have held that the use of R.C. 2317.022 to obtain the records without a warrant violates the constitutional protection against an unreasonable search and seizure. *See, e.g., State v. Saunders*, 5th Dist. Morrow No. 17CA0001, 2017-Ohio-7348, ¶ 19, 31, citing *State v. Clark*, 2014-Ohio-4873, 23 N.E.3d 218, ¶ 42, 45 (3d Dist.) and *State v. Little*, 2014-Ohio-4871, 23 N.E.3d 237, ¶ 40, 43. Our acceptance of Smith's argument about a warrant being required is neither an endorsement nor a rejection of the analyses of those cases.

trial while allowing the paramedics to testify about their own observations at the scene and Smith's statements to them about drinking alcohol. (Doc. # 31 at 2.) But even if we assume that the blood-alcohol test results obtained by Trooper Kelly and the EMS run sheet obtained by investigator Meadows were inadmissible, the record persuades us that the information contained in Meadows' search-warrant affidavit was not tainted by any prior illegality.

{¶ 17} Smith argues that the run sheet contained the paramedics' names and a notation that she had admitted to consuming alcohol. (Appellant's brief at 14.) She maintains that this notation about consuming alcohol itself constituted a protected "medical record" in which she had an expectation of privacy.[6] (*Id.*) Smith contends Meadows used the foregoing information, which had been obtained improperly via a subpoena, to locate the paramedics, interview them, and obtain statements from them about her admission to consuming alcohol. According to Smith, this tainted information then served as the basis for Meadows' search-warrant affidavit. (Appellant's reply brief at 7.)

{¶ 18} We find Smith's argument to be unpersuasive. As a threshold matter, we are unpersuaded that the identity of the paramedics who responded to the scene was a protected "medical record" in which Smith maintained an expectation of privacy.

---

[6] Smith notes that under R.C. 3701.74(A)(8) a "medical record" includes "data in any form that pertains to a patient's medical history, diagnosis, prognosis, or medical condition and that is generated and maintained by a health care provider in the process of the patient's health care treatment." In turn, R.C. 3701.74(A)(5) defines a "health care provider" to include a "health care practitioner." Finally, R.C. 3701.74(A)(4)(r) defines a "health care practitioner" to include "[a]n emergency medical technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic certified under Chapter 4765. of the Revised Code."

Therefore, we see no reason why Meadows would be required to obtain a warrant for that information. And once he knew the identity of the paramedics, Meadows explained that he normally would proceed to interview them, which is what he did. (11/3/2017 Suppression Tr. at 16-17, 21.) In our view, the fact that the paramedics were named in the EMS run sheet did not insulate them from being interviewed or taint the legality of Meadows' interview. Once Meadows decided to interview the paramedics, his discovery of Smith's admission to drinking alcohol was inevitable. As the trial court explained:

> * * * I'm also going to find the potential of inevitable discovery here. I mean, it doesn't take much for an investigating officer to go to the Xenia Fire Department and say, which firehouse handles crash scenes at a certain location?
>
> You go to that firehouse, and you say, on a certain date at a certain time, did any of the units go there? They say, yes. Who are they? And they name them. Then they go and talk to them.
>
> So I'm going to find on that basis without the need for the records, [the paramedics] would be permitted to testify.

(2/9/2018 Suppression Tr. at 15.)

{¶ 19} Under the inevitable discovery doctrine, evidence obtained unconstitutionally is admissible if it "would have been ultimately or inevitably discovered during the course of a lawful investigation." *State v. Perkins*, 18 Ohio St.3d 193, 196, 480 N.E.2d 763 (1985.) "[T]he burden is on the prosecution to demonstrate, within a reasonable probability, that law enforcement would have discovered the evidence in question apart from the unlawful conduct." *State v. Coston*, 168 Ohio App.3d 278, 2006-

Ohio-3961, 859 N.E.2d 990, ¶ 17 (10th Dist.), citing *Perkins* at 196.

{¶ 20} Here Meadows lawfully discovered the identity of the two paramedics. Armed with that information, he proceeded to interview them in the course of his investigation. During those interviews, the paramedics told Meadows about Smith's admission to consuming alcohol. Therefore, even if we accept arguendo that the run sheet and its notation about Smith drinking constituted a protected "medical record," the trial court correctly determined that Meadows independently obtained the same information and that the inevitable-discovery doctrine applied to what Smith told the paramedics. That being so, Meadows properly included Smith's statements to the paramedics about drinking in his search-warrant affidavit to obtain her MVH medical records, including test results revealing her alcohol level.

{¶ 21} On appeal, Smith argues that her statements to the paramedics about drinking were analogous to the written record of those statements in the EMS run sheet. But regardless of whether the run sheet itself might or might not qualify by statute as a "medical record," we are unpersuaded that the Fourth Amendment precluded Meadows from speaking to the paramedics without a warrant and hearing what Smith told them about consuming alcohol. The trial court correctly found that Smith was not in law-enforcement custody when she made her voluntary statements in response to the paramedics' questions. We note too that Smith's statements were not entitled to a statutory privilege. *State v. Wetta*, 12th Dist. Butler No. CA2001-08-184, 2002-Ohio-2597, ¶ 16 (noting that "[p]aramedics are not specifically listed in R.C. 2317.02(B)(1) as covered by the physician-patient privilege" and holding "that information obtained by a paramedic when giving emergency care to an individual is not a privileged communication falling

within the protection of the physician-patient privilege"); *State v. Barrett*, 12th Dist. Butler No. CA2003-10-261, 2004-Ohio-5530, ¶ 36 (applying *Wetta*.) We see no basis for suppressing what Smith told the paramedics at the scene on the basis of any Fourth Amendment violation. We are unconvinced that interviewing the paramedics constituted a search to which the Fourth Amendment's warrant requirement applied.

{¶ 22} In his search-warrant affidavit, Meadows averred that Smith had caused a fatal traffic accident by driving left of center and had been transported to the hospital for treatment and testing. He requested hospital medical records for Smith. In support, Meadows averred:

> 4. Affiant has reviewed the crash report, witness statements, autopsy report and coroner's verdict. Affiant has also personally interviewed the paramedics who responded to the crash.

> 5. Affiant was advised that Kathy Smith told the treating paramedic in the back of the ambulance that she had consumed alcohol prior to the crash; she also told a paramedic who assisted in extracting her from the vehicle that she consumed wine prior to the crash.

> 6. Affiant is aware, through his training and experience, that Miami Valley Hospital generates and maintains records of the results of medical tests performed on the patients they see; they similarly document all medical treatment provided, medications dispensed and pertinent patient statements made.

> 7. The Affiant believes that the information contained within the records maintained by Miami Valley Hospital * * * will aid law enforcement

in their efforts.

(11/3/2017 Suppression Tr. at 24; *see also* State's Exh. 2 to suppression hearing.)

**{¶ 23}** Smith argues that Meadows' affidavit was tainted by Fourth Amendment violations. The first alleged taint involved his statement that Smith told paramedics she had consumed wine. The second alleged taint involved his reference to the hospital maintaining pertinent medical records. Smith contends Meadows' knowledge of these facts was a direct product of Fourth Amendment violations. We disagree. We already have determined above that Meadows properly included Smith's statements to the paramedics about drinking in his affidavit. As for the request to obtain hospital-maintained medical records, Trooper Kelly's accident report revealed that Smith had been involved in a head-on crash and had been taken to the hospital. Meadows also knew that Smith had admitted consuming alcohol prior to the crash. Even if we set aside Meadows' prior awareness that test results existed, it would be expected for Meadows, an experienced investigator, to believe some medical records would exist and to seek those records after learning that Smith had consumed alcohol before going left of center and causing a fatal traffic accident. Indeed, Meadows testified that he would have proceeded exactly the same way without the information from Trooper Kelly about the test results. (11/3/2017 Suppression Tr. at 27, 31.) We are persuaded that Meadows' prior knowledge about Kelly obtaining blood-alcohol test results did not taint his affidavit.

**{¶ 24}** Finally, Smith asserts that on its face Meadows' affidavit failed to establish probable cause justifying a search warrant for her medical records. In support, she contends Meadows averred (1) that he interviewed the paramedics and (2) that he was advised Smith told the paramedics she had consumed alcohol or wine. Smith argues that

these averments are "unsourced hearsay" because Meadows did not explicitly say it was the paramedics who advised him about her drinking. We disagree. Meadows first averred: "Affiant also has personally interviewed the paramedics who responded to the crash." In the *next sentence,* he averred: "Affiant was advised that Kathy Smith told the treating paramedic in the back of the ambulance that she had consumed alcohol prior to the crash; she also told a paramedic who assisted in extracting her from the vehicle that she consumed wine prior to the crash." When Meadows' affidavit is read in context, we believe it is reasonable to infer that the paramedics advised him about Smith's alcohol consumption. The trial court was not required to treat Meadows' averments as unsourced hearsay that failed to establish probable cause.

{¶ 25} Smith also characterizes Meadows' affidavit as being too "bare bones" to support a finding of probable cause. She argues:

> The only information as to Smith's conduct was a statement that she had consumed some sort of alcohol or wine at some point prior to a motor vehicle accident, and that Smith was determined to have travelled left of center by on-scene Ohio State Patrol Troopers. The act of consuming alcohol is not, in and of itself, illegal, nor is the act of driving after consuming alcohol. Even when the totality of the affidavit is considered, it is apparent that these facts were insufficient to allow a neutral magistrate to believe there was probable cause a crime was committed. In the absence of such a showing, the search warrant was not justified and the evidence produced from the warrant, Smith's medical records, should have been suppressed.

(Appellant's brief at 21.)

{¶ 26} Smith's admission about "alcohol" and "wine" consumption "prior to the crash" supports an inference that she meant relatively recently and not in the distant past. In addition, although it is not per se illegal to drive after consuming alcohol, Meadows' affidavit establishes that Smith consumed alcohol and then drove left of center, resulting in a fatal traffic accident. On their face, these facts support a fair inference that Smith's alcohol consumption caused impaired driving, which is illegal. When assessing the sufficiency of probable cause in a search-warrant affidavit, the issuing judge must determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *State v. Hale*, 2d Dist. Montgomery No. 23582, 2010-Ohio-2389, ¶ 16. Our duty is simply to assure that the issuing judge had a "substantial basis" for finding probable cause. *Id.* at ¶ 18. Based on Meadows' affidavit, we believe the issuing judge had a substantial basis for finding a fair probability that Smith's hospital records would contain evidence of alcohol-impaired driving. The first assignment of error is overruled.

{¶ 27} In her second assignment of error, Smith contends the MVH test results showing her blood-ethanol level should not have been admitted at trial because they were not properly authenticated. Smith asserts that the State attempted to authenticate the test results through Taulinah Knox, who served as Smith's "documenting nurse" at MVH. Smith argues that Knox was neither a custodian of the records nor a person who prepared or supervised preparation of the records. Therefore, Smith maintains that Knox was not qualified to authenticate them under Evid.R. 803(6.)

{¶ 28} Upon review, we find Smith's assignment of error to be unpersuasive. Evid.R. 803(6) provides that certain materials are not excluded by the hearsay rule,

including:

> **Records of Regularly Conducted Activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶ 29} Knox testified that she was employed by MVH as a registered nurse. (Trial Tr. at 463.) Her job was to document everything that happened to Smith in the emergency room. (*Id.* at 465, 484.) She identified State's Exhibits 31, 32, 33, and 34 as medical records showing that Smith's ethanol level based on a single blood test was "343," which was "abnormal" and indicated intoxication. (*Id.* at 471-474, 490-491.) Knox testified that after a patient's blood was drawn it went to a lab directly across from the trauma rooms for testing. (*Id.* at 482.) She explained that the lab was operated by CompuNet, a private contractor within MVH. (*Id.* at 489.) Knox testified that the records at issue were "fair and accurate" representations of Smith's records from the day in question. (*Id.* at 471-474.) Knox acknowledged that she did not create Exhibit 31 (*Id.* at 470), and she did not profess

to have created the other three exhibits. She testified that she was not the custodian of records for MVH and did not "maintain" those records. (*Id.* at 489.) She stated, however, that all registered nurses follow the same procedure, that the records they create are stored electronically, that information is recorded in real time, and that the records are kept in the ordinary course of business at MVH. (*Id.* at 467-46.)

{¶ 30} In addition to Knox, the State presented testimony from Dr. Daniel Hood. He testified that he was the medical director of the lab at MVH at the time of Smith's hospital admission. (*Id.* at 494-495.) He explained that for a blood-alcohol test, a patient's blood would be drawn in the emergency room and transferred to the lab through a "pneumatic tube" system. (*Id.* at 499, 501.) The sample then would be tested by automated instruments and the results would be transmitted via the hospital's "information system." (*Id.* at 501-502.) Hood stated that he oversaw and was responsible for all testing in the lab. (*Id.* at 502.) With regard to blood-alcohol testing, he identified the type of machine that was used and explained how it worked. (*Id.* at 502-510.) Hood explained that each test tube of blood had a bar code containing the patient's identifying information and instructing the machine what test to run. (*Id.* at 509-510.) After blood is tested, "the results are electronically transported from computer to computer to the medical record for the patient." (*Id.* at 511.) That "medical record," which in the present case indicated that Smith had an ethanol level of 343 mg/dl, appears to be what Knox identified and discussed in her testimony about State's Exhibits 31, 32, 33, and 34.

{¶ 31} With regard to Smith's case, Hood testified his lab received a blood sample from her to be tested for blood-alcohol content and other things. (*Id.* at 541.) He then again stated that the results from such testing "are electronically transmitted into the

medical records." (*Id.* at 542.) More specifically, the result "drops into a data field in the patient's medical record that corresponds to the test that was ordered." (*Id.*) To retrieve that result, Hood explained: "So you would go into what's known as the Epic system, which is the hospital's electronic medical record system. You would identify the test. You would just click on it with your mouse, and the result would show up." (*Id.* at 543.) He then examined State's Exhibit 33 and testified that he was familiar with the formatting and information it contained. (*Id.*) He noted that under the Epic system, the "basic numeric format" of State's Exhibit 33 was "correct" insofar as it contained "the test name, the result, [and] what's known as the reference range, which would be the expected value." (*Id.* at 544.) With regard to Smith's ethanol level of "343," Hood characterized it as a "high level" and explained that the testing instrument designated it as "abnormal" because it was outside of the reference range. (*Id.* at 548.)

{¶ 32} In our view, the testimony of Knox and Hood was sufficient to support a finding that Evid.R. 803(6) had been satisfied. It is true that neither Knox nor Hood was a custodian of Smith's medical records. Knox also did not prepare or supervise preparation of the records showing Smith's blood-alcohol level. Hood explained, however, that blood testing was automated and that test results were created and maintained electronically. He explained how the results were transmitted and retrieved through "the hospital's electronic medical record system." As noted above, he then examined State's Exhibit 33 and testified that it looked like and appeared to be a blood-alcohol test result stored in the hospital's electronic medical records system. Although Hood may not have been the "custodian" of Smith's records, Evid.R. 803(6) also permits authentication by an "other qualified witness," which simply means "someone with 'enough familiarity with the record-

keeping system of the business in question to explain how the record came into existence in the ordinary course of business.' " *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶ 40. A qualified witness must " 'demonstrate that he or she is sufficiently familiar with the operation of the business and with the circumstances of the preparation, maintenance, and retrieval of the record in order to reasonably testify on the basis of this knowledge that the record is what it purports to be, and was made in the ordinary course of business.' " *State v. Myers*, 153 Ohio App.3d 547, 2003-Ohio-4135, 795 N.E.2d 77, ¶ 60 (10th Dist.), quoting *Keeva J. Kekst Architects, Inc. v. George*, 8th Dist. Cuyahoga No. 70835, 1997 WL 253171, *5 (May 15, 1997.) We believe Hood's testimony in particular satisfied this requirement. The trial court did not abuse its discretion in finding Evid.R. 803(6) satisfied. (Trial Tr. at 673-675.)

{¶ 33} Smith points out in her reply brief that, unlike Knox, Hood only specifically identified one of the four exhibits at issue, namely State's Exhibit 33. We note, however, that State's Exhibits 31 through 34 were single pages from Smith's medical records related to her blood-ethanol testing. Each page contained similar information, and, most importantly, each page stated that the ethanol level in her blood was "343." (Trial Tr. at 470-474.) Therefore, if even one of those pages properly was admitted into evidence, admission of the others could not have been more than harmless error, assuming, arguendo, that there was error at all. Smith's second assignment of error is overruled.

{¶ 34} In her third assignment of error, Smith contends the trial court erred in allowing rebuttal testimony from a pharmacologist as to whether administering Ativan upon her admission to the hospital was equivalent to initiating a medical protocol for alcohol withdrawal.

{¶ 35} The record reflects that Dr. Steven Wunder testified as a defense witness at trial via a video recording. (Trial Tr. at 728.) He stated that he had reviewed "several thousand pages" of Smith's hospital records pertaining to her traffic accident. (Wunder perpetuation depo. at 11.) The crux of Wunder's testimony was that Smith's blood-alcohol test result of 343 mg/dl was inaccurate. He characterized it as a "false positive" and gave several reasons for his opinion. Among other things, he stated that a person with a blood-alcohol level that high would lose consciousness or would have obvious symptoms of intoxication. (*Id.* at 18-19.) Based on his review of Smith's medical records, however, Wunder saw no clinical indications of intoxication. (*Id.* at 14, 22, 27, 34-36.) At several points in his testimony, Wunder also opined that no "alcohol withdrawal protocol" was started for Smith upon or shortly after her admission to the hospital. (*Id.* at 14, 24-25, 61-62, 69.) He noted that the protocol was initiated four days later, for a completely different purpose, in connection with Smith being intubated. (*Id.*) Wunder suggested that the protocol involved or at least included giving a patient Ativan, which was helpful in connection with intubation. (*Id.* at 25, 61.) Wunder testified that, in addition to being useful in cases of alcohol withdrawal, Ativan calms a patient down when on a respirator. (*Id.* at 40.)

{¶ 36} In its rebuttal case, the State called pharmacologist Eljorn Nelson to refute Wunder's testimony. He stated that Ativan is a fast-acting sedative. (Trial Tr. at 734.) According to Nelson, his review of Smith's medical records showed that she was administered Ativan upon admission to the hospital and for the next few days. (*Id.* at 735.) Defense counsel then objected when the prosecutor asked Nelson to explain an "alcohol withdrawal protocol." (*Id.* at 735-736.) Defense counsel asserted that this was beyond the

scope of Nelson's expertise. (*Id.* at 736.) In response, the prosecutor argued that an alcohol withdrawal protocol simply involved administering a sedative to reduce blood pressure and that the protocol was documented in Smith's records. (*Id.* at 737.) The trial court indicated that it was "a little uncomfortable" "having a non-doctor testify about what a medical procedure is." (*Id.* at 751.) The trial court concluded, however, that Nelson could testify as to whether the record did reflect an alcohol withdrawal protocol being initiated upon or shortly after Smith's admission to the hospital, without explaining or interpreting that process. (*Id.* at 751-756.)

{¶ 37} Nelson then testified as follows in response to questioning from the prosecutor:

Q. All right. Dr. Nelson, so if I were to tell you that this courtroom and these Jurors have heard prior testimony that Kathy Smith was, in fact, not placed on an alcohol withdrawal protocol, would that be correct or incorrect?

A. That's incorrect.

Q. And what is the basis for your statement?

A. Well, there's multiple pages in the medical record that say she was.

Q. Okay. Thank You. If there was prior testimony in this courtroom that no doctor noted alcohol, would that be correct or incorrect?

A. That's wrong.

Q. Is that also in the records?

A. It is.

(*Id.* at 758.)

{¶ 38} On cross-examination, the following exchange occurred with defense counsel:

Q. * * * As you said, Ativan is used for lots of circumstances; is that correct?

A. It has multiple purposes.

Q. Okay.

A. It's a sedative, hypnotic, rapid acting—

Q. Okay.

A. –drug.

Q. And it's also commonly used in trauma and intensive care patients which Kathy Smith was; correct?

A. Yes.

Q. Okay. So the fact that she received Ativan would be normal?

A. Yes.

Q. Now, you differ with Dr. Wunder on a withdrawal protocol. You say it was in effect, and he said it was not. So you're saying Dr. Wunder is wrong?

A. Yes page—

Q. And—

A. –page—

Q. –with regard to any—

A. Let me finish answering the question.

Q. No, I just asked you if that's what you were saying.

A. I'm giving the basis for my statement.

Q. Well, I asked you a one-word answer. Next question. That there was no doctor who noted alcohol in the records, you said that was wrong?

A. Yes.

Q. Okay. Dr. Wunder said, no, there were no noted—no doctors noted any alcohol. So, again, Dr. Wunder is wrong?

A. Yeah. Look on page three.

(*Id.* at 761-762.)

{¶ 39} On redirect examination, the following exchange occurred with the prosecutor:

Q. All right. Dr. Nelson, you were just asked about the different purposes for Ativan; correct?

A. Yes.

Q. Would one of those purposes be for an alcohol withdrawal protocol?

A. It would be, yes.

Q. Okay. And, I believe you were trying to answer, do you recall where the records indicate there was an alcohol withdrawal protocol?

A. Page 10, 115, 123, 130, 2,849, 2,859, 2,872, 2,873, possible alcohol withdrawal.

Q. That's the only ones? All right. Do you recall which pages where a doctor noted possible alcohol use?

A. Page 3.

(*Id.* at 763-764.)

{¶ 40} Upon review, we see no abuse of discretion in the trial court allowing Nelson to testify as he did. In his own testimony, Dr. Wunder linked the administration of Ativan to an "alcohol withdrawal protocol." He opined, however, that no alcohol withdrawal protocol was started for Smith upon or shortly after her hospital admission and that she was given Ativan days later for a different purpose. In rebuttal, Nelson did not impermissibly explain an alcohol withdrawal protocol. Rather, he asserted that multiple pages in Smith's medical records showed she was placed on one. On cross-examination, he then agreed with defense counsel that Ativan had multiple uses, it was commonly used in trauma for intensive care patients, and Smith receiving Ativan would be "normal." Although Nelson's statement about the administration of Ativan being "normal" was perhaps something a medical doctor should answer, defense counsel asked the question and the response was favorable to the defense case. Defense counsel then asked Nelson whether he believed Dr. Wunder was "wrong" about an alcohol withdrawal protocol being in effect for Smith. Nelson responded affirmatively, and on redirect examination Nelson cited pages of the medical record that purportedly showed an alcohol withdrawal protocol being in effect. In essence, then, Nelson disputed Dr. Wunder's claim about what the record showed. The record either did or did not reflect the existence of an alcohol withdrawal protocol at any given time during Smith's hospital stay. We do not believe the trial court abused its discretion in allowing Nelson to opine on that issue, which ultimately was one for the jury to resolve. Finally, Nelson stated on redirect examination that treating alcohol withdrawal was one of the potential uses of Ativan. We note, however, that Dr. Wunder stated the same thing during his testimony (Wunder perpetuation depo. at 40),

and defense counsel inquired about the potential uses of Ativan when cross examining Nelson. Therefore, we see nothing objectionable about this aspect of Nelson's testimony either. The third assignment of error is overruled.

{¶ 41} Having overruled each assignment of error, we affirm the judgment of the Greene County Common Pleas Court.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

David M. Morrison
Peter R. Certo
Steven E. Bacon
Hon. Stephen A. Wolaver